UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

JOSEPH FLINSPACH,

                    Plaintiff,

v.                                                      Case No.  5:07-cv-91-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

                    Defendant.
_____/

## ORDER

    Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying his applications for disability insurance benefits and

supplemental security income. (Doc. 1.) The Commissioner has answered (Doc. 8), and

both parties have filed briefs outlining their respective positions. (Docs. 18 & 20.)  For

the reasons discussed below, the Commissioner's decision is due to be **AFFIRMED**

under sentence four of 42 U.S.C. §405(g).

## I.  PROCEDURAL HISTORY

    Plaintiff field his first initial application on March 10, 2000, alleging disability since

May 26, 1998.  (R. 67-69.)  Plaintiff was denied initially and on reconsideration and did

not appeal further.  (R. 31-39.)  Plaintiff filed a second application on January 15, 2002

(R. 29), which was denied initially on April 8, 2002, and Plaintiff did not appeal further.

On April 17, 2003, Plaintiff filed the instant applications for a period of disability,

disability insurance benefits and supplemental security income, alleging a disability

onset date of June 22, 1999. (R. 55-58, 179-82.)  Plaintiff's applications were denied

initially and upon reconsideration. (R. 40-49, 52-54, 170-78.)   Thereafter, Plaintiff timely pursued his administrative remedies available before the Commissioner and requested a hearing before an Administrative Law Judge ("ALJ") (R. 21-I.) The ALJ conducted Plaintiff's administrative hearing on September 6, 2005. (R. 293-321.)  The ALJ issued a decision unfavorable to Plaintiff on May 23, 2006. (R. 10-21.)  Plaintiff's request for review of the hearing decision by the Social Security Administration's Office of Hearings and Appeals was denied.  (R. 3-9.)  Plaintiff then appealed to this Court. (Doc. 1.)

## II. <u>STANDARD OF REVIEW</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking

---

[1] <u>See</u> 42 U.S.C. § 405(g).

[2] <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] <u>Edwards</u>, 937 F.2d at 584 n.3; <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).

into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does

---

[4] Foote, 67 F.3d at 1560; *accord*, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her RFC, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). See also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty at 1278 n.2 ("In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.") (internal citations omitted).

[16] Walker at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.")

the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

At the time of the hearing, Plaintiff was fifty-two (52) years old.  (R. 296.)  He has a high school education (id) and has previous work experience as a machine repairer, a companion, a carnival ride operator, a person who sets up carnival rides, a welder helper, a person who sets up a gospel tent, and a farm worker. (R. 75, 115-22.)  Plaintiff

---

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker at 1003 ("the grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation").

[18] Walker at 1003.

[19] Wolfe at 1077-78.

[20] See id.

[21] See Doughty at 1278 n.2.

5

contends that he has been unable to work since June 22, 1999 due to left arm injuries and right arm nerve damage. (R. 108.)

The record evidence shows that Plaintiff injured his left elbow in a work-related automobile accident in May 1998. (R. 215.) Plaintiff was seen by Stephen J. Raterman, M.D. at the Tampa Orthopedic Clinic from August 1998 until March 1999. (R. 212-16, 208-09.) Plaintiff was treated with epidural injections. On August 10, 1998, Plaintiff complained of low grade left elbow pain but denied numbness radiating, clicking, catching, locking or giving out. (R. 215-16.) On examination, Dr. Raterman noted a full range of motion, negative Tinel's and elbow flexion test and reported that an x-ray of the elbow AP and lateral was normal. (Id.) Dr. Raterman's impression was medial epicondylitis and Plaintiff received an epidural injection in his elbow. (Id.) On August 31, 2008, Plaintiff continued to complain of persistent elbow pain that was unresponsive to anti-inflammatories and the previous epidural injection. (R. 214.) Dr. Raterman's impression was left elbow contusion with possible cubital tunnel syndrome and noted that Plaintiff should continue his current level "which I believe is regular duty." (Id.) On November 12, 1998, Plaintiff continued to complain of left elbow pain. (R. 213.) Nerve conduction tests were negative except for mild medial nerve entrapment (Id.) While Dr. Raterman prescribed a short course of epidural injections and noted that Plaintiff should ice and elevate his elbow, he noted that Plaintiff was "full duty" and that he would see "him back in 3 to 4 weeks for what I hope to be a final check." (Id.) On December 10, 1998, Plaintiff complained of mild left elbow pain. (R. 212.) Dr. Raterman repeated the injection and noted that Plaintiff could continue full duty. (Id.) On February 8, 1999, Plaintiff continued to complain of persistent left elbow pain and

6

reported that he had had several injuries at work because he feels his hand is weak and numb. (R. 209.)   Dr. Raterman referred Plaintiff to the Florida Orthopaedic Institute for a second opinion.  (Id.)

On February 23, 1999, Plaintiff was referred by Workers Compensation to Robert Belsole, M.D. a hand surgeon (R. 187-90.)   On physical examination, Dr. Belsole noted tenderness over the epicondyle of the left medial elbow and a positive elbow flexion test but not that the elbow was not unstable and showed a full range of motion.  (R. 187.) Dr. Belsole opined that Plaintiff has sustained a contusion to the ulnar nerve on the inner aspect of the left arm.  (Id.)  Dr. Belsole noted that Plaintiff had not reached maximum medical improvement and restricted him to no lifting greater than 5 to 7 pounds continuously, and not performing repetitive activities for more than two hours at a time and only for four hours in a day which cannot be consecutive.  (R. 188.)

On April 14, 1999, Alfred Hess, M.D. at the Florida Orthopaedic Institute saw Plaintiff regarding his left elbow pain.  (R. 202-07.)  Plaintiff complained that "it hurts him to rotate the arm" and he reported occasional tingling in his fingers.  (R. 202.)  On examination, Plaintiff had a positive Tinel, ulnar nerve, left elbow, but negative elbow flexion test and no atrophy in the left hand.  (Id.)  Based on his examination, Dr. Hess diagnosed Plaintiff with left cubital tunnel syndrome, ordered a repeat EMG/NCV study to evaluate Plaintiff's condition and directed Plaintiff to avoid putting pressure on his elbow and recommended "light duty work, no lifting greater than 7 lbs, no repetitive use of the left arm." (Id.)  The nerve conduction studies and EMG showed no evidence of cubital tunnel syndrome, entrapment of the ulnar nerve at Guyon's canal or carpal tunnel syndrome, but showed a few 2+ fibrillation potentials in the lower cervical spine

which was suggestive of the need for a cervical MRI to rule out radiculopathy.  (R. 195-96.)  A MRI of the cervical spine performed on May 26, 1999 showed mild broad-based disc bulge asymmetric to the left at the C6-7 level which was producing mild left-sided neural foraminal narrowing and minimal broad-based disc bulge at C3-4.  (R. 193-94.)

On June 17, 1999, Plaintiff saw Jodi Shields, M.D. to follow up on his MRI results.  (R. 192.)  Plaintiff reported that he has problems holding things with his left upper extremity and that he sometimes drops things.  (Id.)  Dr. Shields' assessment was cervical radiculopathy; she ordered cervical epidural injections and prescribed Vioxx, Medrol Dosepak and Ultram.  (Id.)

On April 25, 2000, Plaintiff was seen for a consultative evaluation with Ravneet Sandhu, M.D. (R. 217-21.)  Plaintiff reported pain in his left arm and elbow but denied numbness or tingling in his arm and denied being clumsy or dropping things.  On examination, there was no tenderness along the cervical spine nor spasticity of the paravertebral muscles; no tenderness along the thoracolumbar spine; and range of motion of the cervical and thoracolumbar spine was normal.   Plaintiff's motor system was normal as were deep tendon reflexes.  There was mild tenderness above the medial epicondyle without any swelling or any other signs of inflammation.  Range of motion of the elbow and wrist were normal.  Fine manipulation was well preserved and muscle strength was normal.   Dr. Sandhu opined that there was no sign of functional impairment of the major joints; range of motion of the cervical and thoracolumbar spine is normal without any evidence of paravertebral muscle spasm; gait was normal without an assistive device; and there was no evidence of radiculopathy or motor dysfunction involving the left arm and grip was fairly well preserved.

8

On March 20, 2002, Plaintiff underwent a consultative evaluation with Sudhir I.

Patel, M.D.  (R. 238-41.)   Dr. Patel examined Plaintiff approximately three weeks

before the period of time at issue on this appeal – i.e., April 9, 2002 through June 20,

2002.   Plaintiff reported constant tingling and numbness along the medial aspect of his

left forearm with sharp pain along the lateral aspect of the left forearm.  (R. 239.)  On

examination, Dr. Patel found that Plaintiff's lower extremities were intact.  He had no

difficultly getting on and off the examination table or out of a low level chair and

assuming a standing position.  His gait was normal and he did not need or use an

assistive device.  Plaintiff's grip strength in his left hand was 60% compared to the right.

Plaintiff's motor strength was graded 5/5 in all four extremities; he had a full range of

motion in the cervical spine, thoracolumbar spine, hips and knees.  Abduction and

forceful backward elevation were intact.  Forceful abduction in a horizontal plane in the

left shoulder appeared to be of equal strength compared to the right shoulder.  Flexion

of the left elbow as well as adduction of the left shoulder, hyperaduction and bilateral

elevation of the shoulders were intact.  There was some weakness of the left rhomboid

muscles.  There was no gross winging of the scapula; however, some winging was

noted on the left side.  The claimant was able to make a fist equally with both hands.

On sensory examination, Plaintiff had diminished sensation along the C8 area

dermatome which was at the medial aspect of the left forearm; however, sensation over

the left palm and fingers was intact.  There was some hyperesthesia over the left triceps

area with diminished fine touch sensation.  Superficial reflexes were intact.  Deep

tendon reflexes were exaggerated over both upper extremities.  Bilateral knee and ankle

jerks were somewhat subdued.  Plantars were down going and organic reflexes were preserved.  Romberg testing was normal. (R. 240.)

On April 4, 2002, a Physical Residual Functional Capacity Assessment was completed by Ronald S. Kline, M.D., a non-examining state agency physician.  (R. 244-47, 256.)  Based on his review of the medical records, Kline opined that Plaintiff could occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds, walk/stand and sit for about 6 hours in an 8-hour workday.  Kline noted limitations in pushing and/or pulling in the upper extremities and handling (gross manipulation) with his left hand.  Kline opined that Plaintiff's impairments did not affect function and were not severe. (R. 256.)

On June 23, 2003, Plaintiff underwent a consultative evaluation with R. Krishna Moorthy, M.D.  (R. 253-54.)  On examination, Plaintiff's peripheral pulses were intact and there was no cyanosis, clubbing, pedal edema or calf muscle tenderness.  All sensory modalities were intact and motor tone, power and coordination were all normal.  Deep tendon reflexes were equal and Babinski were negative.  The major joints and hands showed normal range of motion.  There was no deformity, pain, swelling, heat, redness, tenderness or signs of inflammation.  The sensory, motor and reflex findings were normal and there was no paravertebral muscle spasm.  Straight leg raising was negative and gait was normal.  Grip strength and fine manipulation were normal and there were no motor deficits in the extremities.  The result of the repetitive muscle testing, in terms of reproducible fatigue was normal.

On October 2, 2003, Plaintiff underwent a consultative psychological evaluation with Steven F. Wu, Ph.D. ( R. 257-60.)  Plaintiff reported feeling dysphoric, rating it a 6

on a scale of 10 with symptoms including fatigue, apathy, avolition, anhedonia, social withdrawal, and insomnia.   Dr. Wu observed that Plaintiff's judgment was good; his thought process was clear, coherent, organized and goal-directed; and affect was stable, range full and intensity was appropriate.   Plaintiff was oriented in all spheres. On 3 of 3 simple concentration tasks there were no errors.   On serial threes there were no errors, indicating intact sustained concentration.   Plaintiff got two of the last four Presidents in correct sequential order indicating impaired remote memory; seven out of eight well-known facts correct, indicating below average general fund of knowledge. After a five minute delay, Plaintiff recalled four out of four objects, indicating intact short-term recall.   Based on cognitive screening, Dr. Wu concluded that Plaintiff had average verbal intelligence and good working memory.   He noted that Plaintiff's only physical limitation "appears to be range of motion issues with his left elbow and shoulder."   He diagnosed Plaintiff with adjustment disorder with depressed mood.   Plaintiff's global assessment function was 80, indicating no more than a slight impairment with social and occupational functioning.   Dr. Wu opined that Plaintiff's inability to work "appears to be related to his left arm and shoulder."

On October 23, 2003, a Psychiatric Review Technique was completed Timothy D. Foster, Ph.D., a non-examining state agency psychologist.  (R. 261-74.)  Foster opined that Plaintiff's affective disorder was not severe and he found no functional limitations resulting from his affective disorder.

From January 2005 through March 2005 Plaintiff was treated at the Tampa Community Health Center with complaints of heartburn, abdominal pain, muscle

aches and low back pain.  (R. 276-81.)  Plaintiff was diagnosed with gastroesophageal reflux disease, gastritis and low back pain, all of which were treated with medication.

At the hearing on September 6, 2005, Plaintiff testified that he has worked at odd jobs including yard work, picking up papers, raking, washing windows and painting.  (R. 297, 312-13.)   Plaintiff testified that he has problems with his lower back hurting and numbness in his arm.  (R. 297, 299.)   Plaintiff testified that his left arm goes numb but that he is right-handed.  (R. 299, 309.)  Plaintiff testified that he can stand for 30 minutes, lift 10 pounds and sit in a hard back chair for 60 minutes.  (R. 306, 309.) Plaintiff testified that he takes muscle relaxers that help relieve the pain.  (R. 302.)  He testified that he got a cane in approximately December of 2000, that it was not prescribed by a doctor and that he uses it about ten days during the month.  (R. 300-02.)  Plaintiff testified that he can walk about 2 blocks at a moderate speed before he has to stop and rest and then he can go and walk some more; and that he can ride a bike for a short distance.(R. 300, 304, 309.)  Gerald Wili, a vocational expert also testified.  (R. 315-20.)

At the conclusion of the hearing, the ALJ granted counsel's request for Plaintiff to be sent for an additional consultative examination.  (R. 320.)  Accordingly, on November 10, 2005, Plaintiff was sent for an orthopaedic consultative examination with R.W. Springstead, M.D.  (R. 282-91.)   Dr. Springstead took x-rays of Plaintiff's cervical and lumbar spine and the left forearm and did an examination.  Plaintiff complained of neck pain, headaches and dizziness; numbness in his left arm;  intermittent, dull pain in lower back that is sometimes hot and occasionally sharp; and occasional weakness in his left knee.  On examination, Plaintiff had good range of motion of his neck, some discomfort

with mild tenderness posteriorly.  In the upper extremities Plaintiff had slight decreased

sensation in his left arm and some weakness in his left arm with gripping and biceps

and triceps.  Plaintiff had tenderness in the right lower back; he bent over very slowly to

about 90-degrees and had a lot of difficulty trying to straighten up.  Plaintiff had pain

with extension.  In the lower extremities the reflexes were active, no weakness and no

sensory loss.  Straight leg raising test was negative and Plaintiff had good range of

motion of his left knee with no swelling or instability.  The x-ray of Plaintiff's cervical

spine showed slight narrowing at C2-3, C4-5 and C5-6 with minimal osteophytes and no

subluxation.  The x-ray of Plaintiff's lumbar spine showed narrowing at L4-5 and L5 S1

with osteophytes at L4-5, L5 S1, and L3-4, but no fractures or subluxation.   Dr.

Springstead's impression was degenerative disc disease lumbar spine; cervical

spondylosis with history of bulging disc; and cervical radiculitis left arm and hand.   Dr.

Springstead noted that Plaintiff "seems to be having difficulty with his lower back and

with the left arm that goes numb with any activities.  At this point there is probably not

much he could do as far as any medical treatment."  Dr. Springstead then concluded

that Plaintiff "does appear to be disabled and unable to work from an orthopedic

standpoint."   Dr. Springstead also completed a Medical Source Statement Of Ability To

Do Work-Related Activities and opined that Plaintiff could occasionally lift/carry less

than 10 pounds, frequently lift/carry less than 10 pounds, walk/stand for less than 2

hours in an 8-hour workday, and sit for less than 6 hours in an 8-hour workday.  (R.

288-91.)  Dr. Springstead noted limitations in pushing and/or pulling in the upper

extremities and reaching. He also noted that Plaintiff should never climb, balance,

kneel, crouch, crawl or stoop.

13

Before addressing the merits of Plaintiff's claim, the ALJ first addressed the relevant time period.  The ALJ noted that Plaintiff previously filed applications for disability insurance benefits and supplemental security income on January 15, 2002, alleging disability since June 22, 1999 and that the applications were denied by initial determination dated April 8, 2002.  The ALJ found that because Plaintiff did not appeal this determination, it became administratively final and the final decision of the Commissioner through April 8, 2002.  Thus, the ALJ found that the proper period of adjudication before the ALJ was from April 9, 2002 (and not the Plaintiff's alleged onset of disability on June 22, 1999) through June 30, 2002 (the date Plaintiff was last insured.)

In his review of the record, including Plaintiff's testimony and the medical records from several health care providers, the ALJ determined that Plaintiff had an old cervical disc bulge and lumbar degenerative arthritis.  (R. 16.)  However, the ALJ determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (Id.)

The ALJ then found that Plaintiff retained the RFC to perform a restricted range of up to medium work with only occasional climbing, stooping, crouching and crawling.  (R. 16-21.)   The ALJ then concluded that Plaintiff was not disabled because he could perform his past relevant work as a companion and as a ride operator.  (R. 21.)  In reaching this conclusion, the ALJ relied on the vocational expert's testimony that Plaintiff could still perform both of these jobs even if the Plaintiff had only occasional use of one hand.   (Id.)

14

## IV. <u>DISCUSSION</u>

First, Plaintiff argues that the ALJ failed to properly develop the record with regard to Plaintiff's onset date.  It is well-settled that an ALJ has a basic obligation to fully and fairly develop the record.[22]  This obligation exists whether or not a claimant is represented by counsel.[23]  As a hearing is non-adversarial in nature,[24] the duty to develop the record is triggered when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.[25]  The Commissioner's duty to develop the record includes ordering a consultative examination if one is needed to make an informed decision.[26]

Here, Plaintiff argues that he has a slowly progressive impairment and that the ALJ was required to consult with a medical expert to determine whether Plaintiff's onset date was prior to June 30, 2002.  As discussed above, Plaintiff's medical records were limited.  However, this does not render the record evidence ambiguous or incomplete.  Based on the record evidence, Plaintiff's impairments stem from his 1998 motor vehicle accident.  While Plaintiff's treating physicians in 1999 limited Plaintiff to light duty work (R. 202, 208), more recent examinations by Dr. Sandhu in April 2000, Dr. Patel in March 2002 and Dr. Moorthy in June 2003 showed little evidence of continuing limitation.  (R.

---

[22] <u>See</u> <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981); <u>see also</u> <u>Zaldivar v. Apfel</u>, 81 F. Supp. 2d 1353, 1359 (N.D. Ga. 2000).

[23] <u>Zaldivar</u>, 81 F. Supp 2d at 1359.

[24] <u>Id.</u>

[25] <u>See</u> <u>Mason v. Barnhart</u>, 63 Fed. Appx. 284, 2003 WL 1793283, *2 (9th Cir. 2003).

[26] <u>See</u> <u>Reeves v. Heckler</u>, 734 F.2d 519, 522 n.1 (11th Cir. 1984.)

217-19, 238-41, 253-54.)   After examining Plaintiff, Dr. Sandhu opined that there was no sign of functional impairment of the major joints; range of motion of the cervical and thoracolumbar spine was normal without any evidence of paravertebral muscle spasm; gait was normal without an assistive device; there was no evidence of radiculopathy or motor dysfunction involving the left arm; and grip was fairly well preserved. (R. 219.)

Dr. Patel who examined Plaintiff on March 20, 2002, approximately three weeks before the period of time at issue on this appeal – i.e., April 9, 2002 through June 20, 2002 – noted that Plaintiff had no difficulty getting on and off the examination table or out of a low level chair and assuming a standing position and that his gait was normal and he did not need or use an assistive device.  Other than reduced grip strength of 60% in Plaintiff's left hand, some weakness of the left rhomboid muscles, some winging of the left scapula and some minimal diminished sensation, Dr. Patel's findings were largely normal.

Dr. Moorthy, who was the next doctor of record to examine Plaintiff on June 23, 2003, found that Plaintiff's major joints and hands showed normal range of motion and there was no deformity, pain, swelling, heat, redness, tenderness or signs of inflammation.  He also noted that Plaintiff's sensory, motor and reflex findings were normal, straight leg raising was negative, gait was normal and grip strength and fine manipulation were normal and there were no motor deficits in the extremities.

Moreover, the ALJ articulated sufficient reasons for according minimal probative weight to Dr. Springstead's opinion that Plaintiff was disabled.  First, the ALJ noted that Dr. Springstead performed only one consultative examination on Plaintiff and his findings were somewhat consistent with the other treating and examining physicians

negative findings.  Second, the ALJ noted that Dr. Springstead's opinion that Plaintiff could not perform even the minimal exertional requirements of sedentary work was inconsistent with his own objective findings on physical examination.  Indeed, Dr. Springstead's findings on examination were largely normal except for some mild subjective discomfort in Plaintiffs neck; a slight decrease in sensation and some weakness in Plaintiff's left upper extremity; and subjective tenderness in the right lower back.  These findings, which were similar to the findings by Dr. Sandhu in April 2000 and Dr. Patel in March 2002, were not consistent with Dr. Springstead's conclusion that Plaintiff was "disabled and unable to work from an orthopedic standpoint."

Accordingly, the AlJ was not required to order a consultative evaluation before concluding that Plaintiff's impairments were not severe.  On the contrary, the record, although limited, was sufficient for a decision and additional expert testimony was unnecessary.

Second, Plaintiff argues that the ALJ failed to properly consider the combined effect of all of Plaintiff's impairments and subjective complaints.  Specifically, Plaintiff contends that the ALJ failed to assign any limitations to Plaintiff's depression and chronic pain.

With respect to Plaintiff's depression, the ALJ found that Plaintiff's mental impairments produced "no more than slight limitations with the activities of daily living, social functioning and maintaining concentration, persistence or pace."  This conclusion was supported by substantial record evidence.   Indeed, Plaintiff has no history of mental health treatment. (R. 257.)   Moreover, based on his October 2, 2003 psychological evaluation, Dr. Wu diagnosed Plaintiff with adjustment disorder with

17

depressed mood and noted that Plaintiff's global assessment function was 80.   The ALJ explained "that if the claimant was truly suffering with severe depression, Dr. Wu would have noted that in his examination and given the claimant a much lower global assessment function score." (R.19.)  This explanation is both reasonable and logical.

Finally, based on his review of the records, Dr. Foster, a non-examining state agency psychologist opined that Plaintiff's affective disorder was not severe and he found no functional limitations resulting from his affective disorder.  Accordingly, the ALJ's conclusion that Plaintiff's mental impairments produced "no more than slight limitations with the activities of daily living, social functioning and maintaining concentration, persistence or pace" is supported by substantial record evidence.

Plaintiff also argues that the ALJ failed to properly consider Plaintiff's subjective complaints and testimony.  If an ALJ decides not to credit a claimant's testimony about subjective complaints, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.[27]  While an adequate credibility finding need not cite "particular phrases or formulations [...] broad findings that a claimant lacked credibility and could return to her past work alone are not enough to enable a court to conclude that the ALJ considered her medical condition as a whole."[28] A reviewing court will not disturb a clearly articulated credibility finding with

---

[27] Foote v. Chater, 67 F.3d 1553, 1561-62 (11th Cir. 1995); Jones v. Department of Health and Human Servs., 941 F.2d 1529, 1532 (11th Cir. 1991) (finding that articulated reasons must be based on substantial evidence).

[28] Foote at 1562-1563.

18

substantial supporting evidence in the record.[29]  However, a lack of a sufficiently explicit

credibility finding becomes a ground for remand when credibility is critical to the

outcome of the case.[30]  If proof of disability is based on subjective evidence and a

credibility determination is, therefore, critical to the decision,  "the ALJ must either

explicitly discredit such testimony or the implication must be so clear as to amount to a

specific credibility finding."[31] As a matter of law, the failure to articulate the reasons for

discrediting subjective pain testimony requires that the testimony be accepted as true.[32]

In the instant case, it appears as though the ALJ applied the Eleventh Circuit's

pain standard "threshold"[33] assessment to Plaintiff's subjective complaints by noting the

Plaintiff's old cervical disc bulge and lumbar degenerative arthritis.   While the ALJ did

not cite the exact language of the standard, he did state that he "considered all

symptoms and the extent to which these symptoms can reasonably be accepted as

consistent with the objective medical evidence and other evidence based on the

requirements of 20 C.F.R. Sections 404.1529 and 416.929 and SSRs 96-4p and 96-7p."

(R. 16.)  This language, a paraphrase of the pain standard, along with the supporting

findings, shows that the ALJ applied the pain standard.  Moreover, the ALJ cited 20

---

[29] Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986).

[30] Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).

[31] Foote, 67 F.3d at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983) (holding that although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

[32] Id. at 1561-62; Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[33] Marbury v. Sullivan, 957 F.2d 837,  839 (11th Cir. 1992).  .

C.F.R. §§ 404.1529, which contains the same language regarding subjective testimony that the Eleventh Circuit interpreted when initially establishing the pain standard.[34]

In applying the pain standard, the ALJ found that Plaintiff met the initial burden of showing underlying medical conditions, an old cervical disc bulge and lumbar degenerative arthritis, that could be expected to give rise to pain.  Once Plaintiff met this initial burden, however, the ALJ found Plaintiff's statements concerning the "intensity, duration and limiting effects of these symptoms are not entirely credible."  (R. 19.)  In support of this finding, the ALJ explained that the objective medical evidence was not consistent with Plaintiff's testimony that he has very limited use of his left arm and hand. (Id.)  Specifically, the ALJ reviewed in detail Dr. Patel's findings from the March 20, 2002 consultative evaluation and Dr. Moorthy's findings from the June 23, 2003 consultative evaluation.  (Id.)  Additionally, the ALJ correctly noted that Plaintiff's complaints of severe depression were not consistent with Dr. Wu's findings on October 2, 2003.   Finally, the ALJ noted that Plaintiff's allegations that he suffers with severe and disabling impairments is inconsistent with Plaintiff's testimony that he has worked episodically as a handyman and has picked up odd jobs as needed, including painting, maintenance type work, washing windows and yard work.  (Id.)  The ALJ explained that although this medium to heavy work does not amount to substantial gainful activity, "it is an indicator of the claimant's ability to perform a restricted range of medium exertion activity." (Id.)  Accordingly, there is substantial evidence to support the ALJ's decision to discredit Plaintiff's testimony regarding limitations.

---

[34] See Wilson,  284 F.3d at 1226.

Finally, Plaintiff argues that the ALJ failed to give proper weight to opinions of Plaintiff's treating and consultative doctors and instead improperly relied upon the opinion of a non-examining state agency doctor.   The ALJ accorded "considerable weight" to the April 2002 opinion of Dr. Kline, a non-examining state agency doctor.  In doing so, the ALJ explained that the RFC completed by Dr. Kline was more consistent with the majority of the other findings and conclusions in the record.   This finding is supported by substantial record evidence.   Dr. Kline opined that Plaintiff could occasionally lift/carry up to 20 pounds, frequently lift/carry up to 10 pounds, walk/stand and sit for about 6 hours in an 8-hour workday.  Dr. Kline noted limitations in pushing and/or pulling in the upper extremities and handling (gross manipulation) with his left hand and opined that Plaintiff's impairments did not affect function and were not severe. (R. 256.)

Dr. Kline's opinion is consistent with the findings of Dr. Patel, who had examined Plaintiff only a few weeks earlier on March 20, 2002.  (R. 238-41.)   While Dr. Patel noted some weakness in Plaintiff's upper left extremity, he found that Plaintiff's motor strength was 5/5 in all four extremities and he was able to make a fist equally with both hands.  Dr. Patel also found that Plaintiff's lower extremities were intact and he had a full range of motion in the cervical spine, thoracolumbar spine, hips and knees.  Dr. Patel further noted that Plaintiff's gait was normal and he did not need or use an assistive device and that he had no difficultly getting on and off the examination table or out of a low level chair and assuming a standing position.  Dr. Kline's opinion is consistent also with Dr. Moorthy, who examined Plaintiff on June 23, 2003.  While Dr. Moorthy diagnosed Plaintiff with chronic cervical strain with left arm pain, he noted that

21

Plaintiff's major joints and hands showed normal range of motion, Plaintiff's sensory, motor and reflex findings were normal, straight leg raising was negative, gait was normal, grip strength and fine manipulation were normal and there were no motor deficits in the extremities.  Accordingly, the ALJ's decision to accord "considerable weight" to the April 2002 opinion of Dr. Kline is supported by substantial record evidence.

Plaintiff also argues that the ALJ improperly disregarded Dr. Springstead's opinion solely because Dr. Springstead only saw Plaintiff on one occasion.  While this was one basis stated by the ALJ, he also explained in detail that Dr. Springstead's conclusion that Plaintiff could not perform even the minimal exertional requirements of sedentary work was inconsistent with his own objective findings on physical examination.  Further, Plaintiff's assertion is incorrect that Dr. Springstead report is the "only medical evidence in the record in and around Plaintiff's date last insured and there was no other medical evidence which contradicts them."[35]  Indeed, Dr. Springstead did not examine Plaintiff until November 10, 2005, more than three years after the date Plaintiff was last insured. Moreover, both of the doctors who examined Plaintiff closest to the relevant time period – i.e.,  Dr. Patel, who examined Plaintiff on March 20, 2002 and Dr. Moorthy who examined Plaintiff on June 23, 2003 – made findings and rendered opinions consistent with the opinion of Dr. Kline and inconsistent with the opinion of Dr. Springstead. Accordingly, the ALJ articulated sufficient reasons for discrediting the opinion of Dr. Springstead.

---

[35] Doc. 18, page 17.

## V. <u>CONCLUSION</u>

In view of the foregoing, the decision of the Commissioner is due to be

**AFFIRMED** under sentence four of 42 U.S.C. § 405(g).  The Clerk is directed to enter

final judgment consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 2, 2008.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel